THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* SHIRLEY MARSHALL, Defendant-Appellant.

Fourth District   No. 4—82—0145

Opinion filed April 25, 1983.

Daniel D. Yuhas and Don L. Johnson, both of State Appellate Defender's Office, of Springfield, and Ginevera K. Moore, law student, for appellant.

J. William Roberts, State's Attorney, of Springfield (Robert J. Biderman and Denise M. Paul, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE MILLS delivered the opinion of the court:
Murder.
Insanity defense.
Bench trial.
Guilty but mentally ill.
Sentence: 20 years.
We affirm.
First of all, this court is apologetic for the length of this opinion. But since defendant asserts that she was insane at the time of the murder, virtually all of the prolix evidence in this cause is relevant to some measurable extent.

## FACTS

On the morning of February 4, 1981, after eating breakfast, defendant drank about a pint of whiskey and two cans of beer. She was also taking medication for a cold at that time. Sometime that morning, Marvin Smith told defendant that her van—which she had left in a garage at the home of her brother, Virgil Marshall, for the purpose of being repaired—had been moved out of the garage. This information made defendant angry, because the van bore expired license plates, and she feared that if the police saw the plates they might tow the van away. In the late morning or early afternoon of that day, Smith gave defendant a ride to the home of another brother, Dexter Marshall, which was about 1½ blocks from Virgil's home.

Defendant subsequently proceeded to Virgil's residence and found Virgil in his garage in the company of Tom Brooks. The two men were attempting to repair an automobile, and defendant's van was parked in the driveway leading to the garage.

The accounts of Brooks and defendant as to what happened after defendant entered the garage differ in some respects. According to Brooks, the defendant, after entering the garage, asked Virgil why her van was outside. Virgil replied that he and Brooks had temporarily moved the van out of the garage so that they could work on someone else's car, and that they would move it back when they were finished. Brooks began to elaborate on Virgil's explanation of the reasons for the van's removal from the garage, but defendant told him to shut up. The defendant then pulled out a gun and fired three shots, one of which hit her brother, Virgil. After the shots were fired, Brooks hit the floor and remained there until defendant exited from the garage. As Brooks was leaving the garage, he confronted defendant in the driveway. She told him that she was going to "blow his [Brooks'] brains out." Brooks did not remember whether Virgil had anything in his hand at the time of the shooting.

Defendant testified that when she arrived at Virgil's home, she felt "kind of bad" because the van, which was unlocked, was sitting outside in the driveway. When she began to discuss this situation with Virgil, he got angry and started arguing with her, but defendant could not recall exactly what was said. Virgil subsequently picked up the ratchet part of a ratchet wrench and started toward defendant with the ratchet in his hand. At the same time, Brooks grabbed one of defendant's wrists. Defendant told Brooks to let her go, which he did, but Virgil then "let the wrench go" and defendant had a scuffle with him. Virgil later came toward defendant again, and she thought that he was going to hit her head with the ratchet, whereupon she fired two shots from a gun that she had brought with her. The first shot hit a wall; the second hit Virgil. After the shooting, defendant returned to Dexter's home and asked him to call an ambulance for Virgil. The defendant further testified that approximately two weeks prior to the shooting, Virgil kicked her in the stomach.

On cross-examination, defendant stated that she frequently carried a gun with her, primarily for the purpose of protecting her house, and preventing people from stealing things from her. She also acknowledged that one of the reasons for her concern as to whether her van bore the proper license plates was that she was trying to make sure that her conduct conformed to the requirements of the applicable law. She admitted that on the day of the shooting, she was not angry

at anyone else, and that on that day she knew that it would have been unlawful for her to pull out her gun and shoot someone at Dexter's home.

The only unusual thing that Dexter Marshall noticed about defendant on the day of the shooting was that she was a little quieter than usual. According to Marvin Smith, defendant appeared calm and he noticed nothing unusual about her during the ride from her residence to Dexter Marshall's home. Cleo King, who was at Dexter's residence at the time of the shooting, stated that defendant said that she shot Virgil because "she was just tired of people messing with her," and that defendant said that she hoped Virgil was dead. He further stated that following the shooting, defendant looked very upset, and in King's opinion defendant's conduct on the day of the shooting was different from her normal conduct.

According to James Zimmerman (one of the police officers who transported defendant to the police station) the defendant kicked him in the knee several times while being taken to the prisoner transport van at the scene of the shooting. During the trip to the station, the defendant was "very combative, both verbally and physically." She stated that she "shot him [Virgil] and hoped that he [Virgil] was dead" and that "she would do it to us [the police officers], too, if we didn't let her go." The defendant was still combative when she arrived at the police station, but calmed down when a police officer engaged her in a conversation about fishing, which is apparently a favorite avocation. Zimmerman testified that it is not unusual for persons placed under arrest to be combative, and that there was nothing in defendant's behavior that he had not seen before.

Pat Ford, a female police officer, participated in the booking of defendant. When Ford first saw the defendant, she was "mad or angry and excited" and was yelling that "she would teach her brother from messing around with her and she hoped he was dead," but she later calmed down. In Ford's opinion, the defendant was coherent and was acting logically on the day of her arrest. Ford also stated that the defendant's conduct on that day was not substantially different from that of many other arrestees whom she had previously seen.

Officer Flavian Hughes similarly testified that defendant was combative when she first arrived at the police station, but that she calmed down when he and other officers started talking to her about fishing. The defendant and a group of police officers then carried on a logical, coherent conversation for about 20 minutes.

The defendant presented the testimony of two expert witnesses. The first, Dr. Nieves Tan-Lachica, a psychiatrist, was Marshall's treat-

ing physician at McFarland Zone Center from April 9, 1981 (when defendant was committed to McFarland following a finding that she was unfit to stand trial), until May 31, 1981. From the latter date until shortly before the date that defendant's trial commenced (January 25, 1982), Dr. Tan-Lachica supervised the physician who was directly responsible for defendant's treatment. Dr. Tan-Lachica had extensively discussed the events of February 4, 1981, with defendant, and defendant's accounts of events on that date were very consistent. She believed that defendant truthfully related to her, defendant's perception of what occurred on the day of the shooting.

During her stay at McFarland, the defendant was treated for paranoid schizophrenia. When first committed, she was preoccupied with much paranoid thinking and "thought that a lot of people had messed up her life." With the exception of one temporary relapse, her condition thereafter consistently improved as a result of medication. Following her discharge to the custody of the Sangamon County sheriff's office for the purpose of standing trial, the defendant was continued on the same medication which she had been receiving at McFarland. The purpose of the medication was to control defendant's psychosis and depression.

The defendant's second expert witness, Dr. Philip Bornstein, also a psychiatrist, first saw the defendant in the spring of 1976, shortly after she gave birth to a daughter. The reason for the initial consultation was that defendant's attending physician was concerned about her mental state and her ability to care for her newborn daughter. At that time, Bornstein made a diagnosis of chronic schizophrenia, probably of the paranoid type. The second period of Dr. Bornstein's contact with defendant occurred between January and April 1977, when defendant was incarcerated in the Sangamon County jail. She was referred to Bornstein by the jail physician for treatment of a psychiatric problem. Following three or four weeks of treatment, Bornstein diagnosed defendant as suffering from chronic paranoid schizophrenia.

In 1978, defendant voluntarily entered St. John's Hospital in Springfield for psychiatric treatment, and Dr. Bornstein was her treating physician. At the time of defendant's admission, "[s]he was very upset and worried because she felt that her parents had cut a hole inside her." Bornstein again diagnosed defendant's condition as paranoid schizophrenia. Dr. Bornstein also saw defendant on one occasion in 1979, and at that time she was still suffering from schizophrenia.

On both February 24, 1981, and October 20, 1981, Dr. Bornstein examined defendant for 1½ to two hours in an effort to ascertain her

state of mind on the day that she shot Virgil. At both interviews, defendant indicated that she shot her brother because she thought that he was going to hit her with a wrench.

Dr. Bornstein described defendant's conduct and state of mind at the time of the first interview as "hostile, belligerent, profane, yelling, disorganized, she couldn't concentrate, mad at everyone, no one wanted to help her, everyone was out to get her." At the second interview, defendant "had many of the same kinds of thoughts [as at the time of the first interview] but with much less intensity," and she was able to engage herself in an organized conversation "with less suspicion."

Dr. Bornstein testified that based on his total knowledge of the defendant, there were two possible explanations for her conduct on the date of the shooting: first, that Virgil did in fact come at her with a wrench; second, that she merely perceived that Virgil had a dangerous object in his hand, and that she was in danger from him. The second explanation was a possibility because a perception on the part of defendant that she was in danger from Virgil would have been compatible with her prior history.

Dr. Bornstein opined that the defendant was—to a reasonable degree of medical certainty—suffering from paranoid schizophrenia on the date of Virgil's death. Furthermore, he believed that on that date, defendant knew that it was against the law to shoot another person, except in self-defense. The defendant did not feel that she was breaking the law in shooting Virgil, however, because of her feeling that she was indeed acting in self-defense.

In Dr. Bornstein's view, the defendant, at the time of the shooting, lacked substantial capacity to conform her conduct to the requirements of the law because "[s]he has done what she felt she had to do—her feelings and her thoughts were being influenced by psychiatric disease, regardless of what the law exactly was. This has been her behavior then; it was her behavior in the past. She's not always able to do what the law requires of her." As further reasons for his conclusion that at the time in question the defendant was unable to conform her conduct to the requirements of the law, Dr. Bornstein stated that defendant had every known symptom of paranoid schizophrenia, that she is hostile, unstable, threatening and violent when she is not receiving treatment for her schizophrenia, and that to his knowledge, she was not receiving treatment at the time that she shot Virgil.

Based on his long period of acquaintanceship with defendant, Dr. Bornstein also believed that she told him the truth as to events on February 4, 1981, as she perceived them.

On cross-examination, Dr. Bornstein admitted that a third possible explanation for defendant's shooting Virgil was that she just did not like him and decided to kill him. The following exchanges subsequently occurred between the prosecutor and Dr. Bornstein:

"Q [Assistant State's Attorney Shiffman]. Now, you also indicated it's your opinion that Miss Marshall lacked substantial capacity to conform her conduct to the requirements of the law, but you've indicated by your testimony that she was in reality acting in self-defense, and so then she did not lack that capacity, is that your testimony?

A [Dr. Bornstein]. I don't think she cared about the law. I think maybe that's a more accurate way to put it.

She perceived herself to be in danger, felt she had the right to shoot her brother because she thought she was going to get herself hurt.

If there was something there, a wrench there—I think someone else had to decide whether that is right or wrong. But if there wasn't a wrench there, it was much more of a paranoid ideation, the ones she's always had.

Q. But Doctor, isn't it correct to say that if there was in fact a wrench there, and she had the legal right to act in self-defense, that at that point in time she did have the legal capacity to conform her conduct to the law—isn't that correct?

A. ***

I really don't think that, whether or not she was acting in self-defense, has anything to do with her perception—I mean of her ability to conform her conduct. I think she would have shot him either way ultimately, because she was so afraid of him. You know, I think she could have had a policeman standing there and she would have done it.

Q. Doctor, is what you're saying to the Court then, if she actually committed murder, she's innocent; but if she actually acted in self-defense at the same time, she is insane?

A. No, I didn't say that. I think she—either one is entirely possible.

Q. So she is not insane?

A. Insane is a legal term, but she was actively schizophrenic when she did it. The only problems in my mind is what the actual facts are. She has repeatedly, consistently asserted to me that her brother had a wrench. And I wasn't there and I don't know what is the fact. But that is from her point of view of what the facts are, at least.

Q. But at the same point in time, based on your examination of her, you're content or it's your opinion she could have two possible different mental states at that time, depending on other facts?

A. You're not changing anything—her mental state was the same.

* * *

Q. ***

Essentially, as I understand your testimony, would it be fair to say that you cannot say with a reasonable degree of medical certainty whether or not at the time Miss Marshall shot Virgil Marshall, she was insane—it depends on the facts that you're not familiar with at the time of the occurrence—is that correct?

A. No, I don't believe that is correct, Mr. Shiffman, and that's really the key to this matter. I really would like to explain that reason again, if I might.

Q. All right; sure.

A. Miss Marshall had severe active paranoid schizophrenia at the time she shot her brother. There is no doubt in my mind she shot her brother. She admitted to it.

The problem is whether or not she did it in self-defense. She had the disorder anyway. How anybody wants to interpret what happened is another matter. I don't know what all the evidence is here. All I know is what she says she saw."

Finally, Dr. Bornstein acknowledged the preparation of a report of his November 11, 1981, examination of the defendant, in which he concluded that while defendant was probably psychotic at the time that she shot Virgil, her schizophrenia was not the primary operative factor in her shooting Virgil. Rather, she shot Virgil because she perceived that she was in danger from a weapon which she saw. In acknowledging the preparation of this report, Dr. Bornstein stated that the only addition he would make was that the report was based on defendant's absolute assertion that a wrench was, in fact, present at the time and place of the shooting.

At the conclusion of the evidence, the court found defendant guilty but mentally ill.

I

We first consider defendant's contention that the State did not establish beyond a reasonable doubt that she was sane at the time she shot her brother, Virgil. Section 6—2(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1981, ch. 38, par. 6—2(a)) provides:

"Insanity. (a) A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law."

Once a defendant presents sufficient evidence to create a reasonable doubt as to his or her sanity at the time of the relevant offense, the State must establish beyond a reasonable doubt that the defendant was sane at that time in order to secure a conviction. (*People v. Kuhn* (1979), 68 Ill. App. 3d 59, 385 N.E.2d 388.) In meeting this burden of proof, the State is not required to produce expert testimony as to the defendant's sanity at the time of the offense, but may rely on facts in evidence and the inferences which the trier of fact may draw therefrom. (See *People v. Ross* (1978), 63 Ill. App. 3d 884, 380 N.E.2d 897.) The weight to be accorded an expert's opinion as to a defendant's sanity is to a great extent dependent on the factual details which the expert provides to support his or her opinion. (*People v. Spears* (1978), 63 Ill. App. 3d 510, 380 N.E.2d 423.) The trier of fact may properly reject expert testimony that a defendant was insane at the time that he or she committed an offense and conclude that the defendant was sane solely on the basis of lay testimony. (See *People v. Dominique* (1980), 86 Ill. App. 3d 794, 408 N.E.2d 280.) Finally, whether a defendant was sane when he or she committed an offense is a question for the trier of fact, whose finding will not be disturbed on review unless it is so improbable or unsatisfactory that it raises a reasonable doubt as to a defendant's sanity. *People v. Ward* (1975), 61 Ill. 2d 559, 338 N.E.2d 171.

■ Applying these controlling principles to the facts of this case, we are of the opinion that the State established beyond a reasonable doubt that defendant was sane when she shot Virgil Marshall. The only evidence offered in support of defendant's assertion that she was insane at the time of the shooting was the opinion of Dr. Bornstein that she was at that time incapable of conforming her conduct to the requirements of the law. However, the totality of Dr. Bornstein's testimony raises serious doubts as to the validity of this conclusion. *First*, there is Dr. Bornstein's testimony that a paranoid delusion on the part of defendant that Virgil posed a threat to her, when in fact he did not, is one of only three possible explanations for defendant's shooting Virgil. *Second*, Dr. Bornstein believed that at the time of the offense, defendant knew it was against the law to shoot people except in self-defense, and that she felt that she was not breaking the law in shooting Virgil because of her feeling that she was indeed acting in

self-defense. *Third,* Dr. Bornstein implied that perhaps a better way of characterizing defendant's mental state at the time of the shooting was that she simply did not care about the law, rather than that she lacked the capacity to conform her conduct to the requirements of the law. *Fourth,* and most significantly, Dr. Bornstein acknowledged the preparation of a report containing a statement that if, in fact, Virgil had a wrench at the time of the shooting, defendant's schizophrenia was not the primary operative factor in her shooting Virgil.

In our view, that testimony effectively eviscerates Dr. Bornstein's opinion that defendant was unable to conform her conduct to the requirements of the law at the time she shot Virgil Marshall. Such opinion is therefore, under *Spears,* entitled to little, if any, weight in ascertaining whether defendant was sane at the time of the offense with which she was charged.

Moreover, the testimony of defendant herself demonstrates that she was able to conform her conduct to the requirements of the law—and was thus sane—at the time of the shooting. The admitted source of the defendant's perturbation at her van being removed from Virgil's garage was her desire to avoid the penalties which she might incur as a result of her failure to conform her conduct to the laws relative to motor vehicle registration. Further, the defendant admitted that on the day of the shooting, she refrained from pulling out her gun and shooting people at Dexter Marshall's home because she knew that such conduct would have been illegal.

Indeed, the evidence offered in support of the proposition that defendant was insane at the time she shot Virgil Marshall was weak and the State was required to present only a sufficient amount of contrary evidence in order to establish beyond a reasonable doubt that defendant was sane at the time of the shooting. This the State did by presenting the testimony of Marvin Smith that defendant appeared calm and did nothing unusual during the ride from her residence to Dexter Marshall's home and the testimony of Dexter Marshall that the only unusual thing that he noticed about defendant on that day was that she was a little quieter than usual. Cleo King's testimony that defendant was upset on the day of the shooting and was not acting like herself does not mandate a contrary holding. It is not clear from the record whether King's testimony relates to defendant's conduct before or after the shooting, and in any event the trier of fact was entitled to disbelieve King's testimony and to instead regard the testimony of Smith and Dexter Marshall as conclusive evidence of defendant's sanity at the time of the offense.

We agree that the conduct of defendant on the day that she fa-

tally wounded her brother was unusual and bizarre. But more than that is needed to establish that a defendant was insane at the time of an offense. (See *Ward.*) Otherwise, all persons accused of egregious crimes could avoid criminal responsibility for their actions by simply asserting that they were insane at the time of their transgressions. On the basis of the record before us, we believe that the State met its burden of establishing beyond a reasonable doubt that defendant was sane at the time that she murdered Virgil Marshall.

No error.

## II

The defendant also contends that the evidence adduced at her second competency hearing was insufficient to establish that she was fit to stand trial. On April 3, 1981, defendant was found unfit to stand trial and was committed to the Department of Mental Health for treatment, but at a second competency hearing, held on August 24, 1981, defendant was found fit to stand trial and was remanded to the custody of the Sangamon County sheriff.

The sole witness at defendant's second competency hearing was Dr. Tan-Lachica, who testified that defendant's psychosis was controllable only through the use of medication and implied that during her trial, the defendant would continue to receive the same medication she had received while in the custody of the Department of Mental Health. However, Dr. Tan-Lachica further testified that defendant was able to understand the nature of the "criminal problems" pending against her, that she understood the charges placed against her, and that defendant had the capacity to assist her attorney by advising him of facts relevant to her defense.

The fact that a defendant's mental capabilities are maintained through the use of medication is irrelevant to a determination of whether the defendant is fit to stand trial. (*People v. Dalfonso* (1974), 24 Ill. App. 3d 748, 321 N.E.2d 379.) We conclude that the evidence presented at defendant's second competency hearing did not create a *bona fide* doubt as to her fitness to stand trial (see Ill. Rev. Stat. 1981, ch. 38, pars. 104—10, 104—11(c)), and the trial court therefore acted properly in holding that defendant was fit to stand trial at the conclusion of that hearing.

Defendant additionally urges that a statement which Dr. Tan-Lachica made at her second competency hearing, that the stress of a trial could cause psychosis, accompanied by memory lapses, to reappear, coupled with defendant's actual conduct at trial, demonstrates that she was actually unfit to stand trial. The only direct evidence of

defendant's behavior at trial is the testimony of her trial attorney, Bruce Locher, at the hearing on defendant's post-trial motion. According to Locher, defendant "sat through this entire proceeding [the trial] like a stone." Furthermore, while the third witness was testifying on the first day of her trial, defendant asked Locher, "When is my trial going to start?" Following the defendant's trial, a Sangamon County sheriff's deputy contacted Locher and told him that, "Shirley didn't know what had happened, didn't understand what had happened, and would I please come up and talk to her and discuss what had happened during the course of her trial."

A thorough review of the transcript of defendant's trial testimony convinces us that defendant responded to all questions put to her in a clear and coherent manner, and that she is a rather intelligent individual who was in full control of her mental faculties during the trial. We trust that if the trial judge, who observed defendant throughout the trial, had entertained serious doubts as to her continuing fitness to stand trial, he would have interrupted the proceedings and *sua sponte* ordered a hearing as to defendant's competency, as would have been his duty in such a situation. (*People v. Chambers* (1976), 36 Ill. App. 3d 838, 345 N.E.2d 119.) The trial record, however, contains no evidence which would support a holding that the trial judge should have conducted such a midtrial hearing, and in fact contains not a shred of *indicia* that defendant may have been unfit to stand trial.

In view of the clarity and lucidity of defendant's trial testimony, the self-serving post-trial statements of defendant and her attorney to the general effect that defendant did not understand that she was on trial while the trial was going on, are insufficient to raise a *bona fide* doubt as to defendant's fitness to stand trial. (See generally *People v. Motis* (1962), 23 Ill. 2d 556, 179 N.E.2d 637.) The principal case on which defendant relies in support of her position on this issue, *People v. Thompson* (1978), 60 Ill. App. 3d 198, 376 N.E.2d 442, is clearly distinguishable. In *Thompson* the quantum of evidence of the defendant's unfitness was of a much greater magnitude, and the evidence was much more convincing, than the evidence offered in support of the allegation that defendant Marshall was unfit to stand trial.

For these reasons, we hold that the evidence in the record before us is sufficient to support the trial court's determination that defendant was fit to stand trial, and that under the circumstances of this case, the trial court was under no obligation to hold a midtrial competency hearing on its own motion. *Cf. People v. Sims* (1966), 34 Ill. 2d 206, 215 N.E.2d 201 (clarity and lucidity of defendant's trial testi-

mony supports holding that there is no *bona fide* doubt as to defendant's sanity at the time of trial); *People v. Davis* (1978), 65 Ill. App. 3d 580, 382 N.E.2d 594 (fact that defendant suffers from mental disturbance is insufficient to raise *bona fide* doubt as to his ability to stand trial, where coherence and lucidity of defendant's statements are inconsistent with claim of unfitness).

No error.

## III

Closely related to defendant's contention that she was unfit to stand trial is her contention that she did not knowingly and understandingly waive her right to a jury trial. Defendant alleges that in view of her mental condition and history of mental illness, the trial court should have made a more careful effort than it did to ascertain whether she understood the implications of her decision to waive a jury trial. The following colloquy took place at defendant's jury waiver hearing:

"THE COURT: Now you understand that under our law you have a right to have a jury determine your guilt or innocence?

THE DEFENDANT: Yes.

THE COURT: Do you know what a jury trial is?

THE DEFENDANT: Twelve people.

THE COURT: To determine your guilt or innocence?

THE DEFENDANT: Yes.

THE COURT: And it is your desire to give up that right?

THE DEFENDANT: Yes.

\* \* \*

THE COURT: Now you have discussed this with your attorney, have you not?

THE DEFENDANT: Yes.

THE COURT: This waiving of the jury?

THE DEFENDANT: Yes.

THE COURT: And based upon his information and your feeling, you wish to give up that right?

MR. LOCHER [Defendant's attorney]: I think I would like to interject for the record.

I advised my client not to waive her right to a jury trial, Judge, it's her wish that she waive a jury trial, its' contrary to my advice, my advice would be to retain the jury.

THE COURT: There's some question in this file that she is under psychiatric care, is she not?

MR. LOCHER: She is presently out at McFarland Zone Cen-

ter.

MR. SHIFFMAN [Prosecutor]: She has been found fit to stand trial.

THE COURT: She has been found fit?

MR. SHIFFMAN: Yes.

THE COURT: Now, Miss Marshall, your attorney has advised you to have a jury trial, you understand, but you don't want a jury?

THE DEFENDANT: No.

THE COURT: You want just a judge to decide your guilt or innocence?

THE DEFENDANT: Yes.

THE COURT: Let the record show then that the defendant in open court has advised the court that she understands what a jury trial is, she understands that she has a right to a jury trial, the record should further disclose that her attorney, Mr. Locher, has advised her to submit this matter to a jury, but she persists in her desire to waive a jury.

Is that correct?

THE DEFENDANT: Yes."

During his examination of defendant, the court also inquired as to defendant's age and educational background. Defendant stated that she was 34 years old and had attended one year of college.

In ascertaining whether a jury waiver is made in a knowing and understanding manner, a trial court is not required to conduct an inordinately long examination of the defendant nor to provide the defendant with a detailed explanation of the consequences of a jury waiver. (*People v. Murff* (1979), 69 Ill. App. 3d 560, 387 N.E.2d 920. To our view, the manner in which the trial court interrogated defendant far exceeded the minimal requirements for ascertaining whether a jury waiver is understandingly and knowingly made.

■ With respect to defendant's contention that because of her mental condition and her history of mental disease the trial court was obligated to exercise greater caution in determining whether she understood the implications of her decision to waive a jury trial, the defendant had been found competent to stand trial prior to her jury waiver hearing, which took place on December 14, 1981. Evidence sufficient to support a finding that a defendant is fit to stand trial is generally sufficient to support a finding that a defendant is competent to waive his or her right to a jury trial, especially where there is no conflict in the psychiatric testimony presented at the hearing on defendant's fitness to stand trial. (See *State v. Decello* (1974), 111

Ariz. 46, 523 P.2d 74.) In the case at bar, there was no conflict in the psychiatric testimony presented at the hearing on defendant's fitness to stand trial. Furthermore, there is no evidence of a deterioration in defendant's mental condition between the time that she was found fit to stand trial and the time that she waived her right to a jury trial, and there is likewise no evidence that defendant's trial attorney did not fully advise her of all of the consequences and implications of waiving a jury trial.

The case upon which defendant chiefly relies in support of her argument that she did not knowingly and understandingly waive her right to a jury trial (*Murff*) is inapposite. There, the record contained no positive evidence whatsoever that the defendant knowingly and understandingly waived a jury trial. In the present case, by contrast, the record contains ample evidence that defendant knowingly and understandingly waived that right.

No error.

## IV

The defendant further asserts that because of the vagueness of the language of subsection 5—2—6(b) of the Unified Code of Corrections (Ill. Rev. Stat. 1981, ch. 38, par. 1005—2—6(b)) relevant to the treatment of persons found guilty but mentally ill, she is not assured of receiving any treatment for her mental illness while incarcerated. Subsection 5—2—6(b) provides:

> "If the court imposes a sentence of imprisonment upon a defendant who has been found guilty but mentally ill, the defendant shall be committed to the Department of Corrections, which shall cause periodic inquiry and examination to be made concerning the nature, extent, continuance, and treatment of the defendant's mental illness. The Department of Corrections shall provide such psychiatric, psychological, or other counseling and treatment for the defendant as it determines necessary." :

Defendant specifically contends that since subsection 5—2—6(b) prescribes no time frame for the performance of the "periodic inquir[ies] and examination[s]" in regard to a prisoner's mental illness, and since the Department of Corrections (DOC) need only provide the psychiatric treatment and counseling which "it deems necessary," this provision allows the DOC to effectively deprive defendants who are incarcerated after being found guilty but mentally ill of necessary treatment for their mental illnesses, in violation of their constitutional right to treatment.

The sole case which defendant cites in support of the above argument is *Youngberg v. Romeo* (1982), 457 U.S. 307, 73 L. Ed. 2d 28, 102 S. Ct. 2452. That case involved a seriously retarded individual who had been involuntarily committed to a State mental hospital. The court held that the patient's fourteenth amendment "liberty interests" required that the State provide him with the amount of minimally adequate training necessary to insure that he would be able to care for and control himself, to the extent that he would be free from unreasonable restraint and safe from attacks by fellow patients.

Defendant's argument that her incarceration is violative of her constitutional right to treatment necessarily rests on the premise that a person sent to prison following a verdict or finding of guilty but mentally ill is "involuntarily committed." This assumption is clearly erroneous. Persons found guilty but mentally ill and sent to prison are not "committed" to anything, but are sentenced to prison as punishment for crimes which they have committed. If it were not for their criminal conduct, such individuals would not be incarcerated. They are incarcerated for their crimes, not their mental condition.

■ The right to treatment articulated in *Youngberg* and similar decisions of lower Federal courts (see, *e.g., Nelson v. Heyne* (7th Cir. 1974), 491 F.2d 352) derives its very being from the fact that adults committed to mental institutions and juveniles committed to juvenile correctional facilities are not incarcerated as a result of convictions of criminal offenses. Instead, they are confined solely because they have been found in need of rehabilitative treatment for such problems as mental illnesses, difficulty in conforming their conduct to social norms, etc. If treatment is not provided, their continued incarceration amounts to illegal detention. Since prison sentences imposed upon persons found guilty but mentally ill are a direct result of criminal offenses of which such persons have been convicted following trials in which they enjoyed the full panoply of procedural safeguards available to other adult defendants, it follows that such prisoners enjoy no separate constitutional right to treatment for their mental health problems beyond the constitutional right to minimally adequate medical care which is applicable to all prisoners. Thus, defendant's contention that her incarceration is violative of a specific constitutional right to treatment for her mental illness is utterly lacking in merit.

No error.

V

The defendant shot Virgil Marshall on February 4, 1981. The statutory provision providing for a verdict of guilty but mentally ill (Ill.

Rev. Stat. 1981, ch. 38, par. 115—4(j)) became effective September 17, 1981, and defendant was tried on January 25-27, 1982. The defendant contends that the application of subsection 115—4(j) to an offense committed before its effective date is violative of the State and Federal constitutional proscriptions of *ex post facto* laws.

The classic and generally accepted statement of the types of laws which are *ex post facto* is contained in the 18th century seminal case of *Calder v. Bull* (1798), 3 U.S. (3 Dall.) 386, 390-91, 1 L. Ed. 648, 650:

> "1st. Every law that makes an action done before the passing of the law; and which was innocent when done, criminal; and punishes such action. 2d. Every law that aggravates a crime, or makes it greater than it was, when committed. 3d. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different testimony, than the law required at the time of the commission of the offense, in order to convict the offender."

Subsection 115—4(j) obviously does not aggravate any offenses committed before its effective date. Nor does it alter the rules of evidence.

Furthermore, the application of subsection 115—4(j) to the instant case did not result in the infliction upon defendant of a greater punishment for murder than existed at the time that she fatally wounded Virgil Marshall. Rather, subsection 115—4(j) merely altered the conditions of defendant's confinement by insuring that she will receive adequate treatment for her mental health problems while incarcerated. (See Ill. Rev. Stat. 1981, ch. 38, par. 1005—2—6(b), (c).) Statutes which change the conditions under which punishment for an offense is imposed, but which do not significantly alter the fundamental nature of the punishment, are not *ex post facto* laws. (*Malloy v. South Carolina* (1915), 237 U.S. 180, 59 L. Ed. 905, 35 S. Ct. 507; *Carter v. Burt* (1866), 94 Mass. 424.) Moreover, statutes which mitigate the penal provisions of a statute in force at the time of an offense are not regarded as *ex post facto* with respect to that offense. (*Rooney v. North Dakota* (1905), 196 U.S. 319, 49 L. Ed. 494, 25 S. Ct. 264.) Subsection 115—4(j) merely alters the conditions of confinement of a person imprisoned as a result of a criminal offense, and quite probably ameliorates the conditions of confinement by insuring that such an individual receives adequate treatment of his or her mental health problems. Consequently, we conclude that under the facts of

this case, the application of subsection 115—4(j) to a murder committed prior to its effective date did not alter or increase the penalty for that offense within the meaning of the *ex post facto* doctrine.

Defendant also argues that the application of subsection 115—4(j) to an offense committed before its effective date has the possible effect of making criminal an action which was innocent before enactment of the relevant portion of that subsection in that such an application of subsection 115—4(j) deprived her of some of the defenses available at the time of the murder. The basis for this assertion is that if defendant's trial counsel had known that the subsection 115—4(j) was going to be applicable to the case, he might have chosen to avoid the possibility of defendant being found guilty but mentally ill by basing his defense on the theory that defendant shot Virgil Marshall in self-defense or lacked the intent necessary to commit a murder, as opposed to the theory that defendant was insane at the time of the shooting. (A defendant may be found guilty but mentally ill only if he or she presents the affirmative defense of insanity at trial. Ill. Rev. Stat. 1981, ch. 38, par. 115—4(j).)

■ While it is well settled that a statute which completely deprives a defendant of a defense available at the time of an offense is an *ex post facto* law (*Beazell v. Ohio* (1925), 269 U.S. 167, 70 L. Ed. 216, 46 S. Ct. 68), we believe this case presents the question of whether a statute which merely makes the assertion of certain defenses less desirable than they would have been at the time of an offense is violative of the *ex post facto* doctrine. Counsel cites no cases which so hold, and our research has disclosed none. Since the guilty but mentally ill statute did not operate to completely deprive defendant of any defense available to her on the date of her offense, we are of the opinion that defendant's argument as to this prong of the *ex post facto* doctrine is likewise void of merit.

No error.

## VI

■ Lastly, defendant contends that subsection 115—4(j) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1981, ch. 38, par. 115—4(j)), which created the verdict of guilty but mentally ill, was improperly applied as a retroactive law. We disagree. A retroactive law is a law that takes away or impairs vested rights acquired under existing laws, or which creates a new obligation, imposes a new duty, or attaches a new disability in respect to transactions or considerations already passed. (*United States Steel Credit Union v. Knight* (1965), 32 Ill. 2d 138, 204 N.E.2d 4.) The general rule that statutes will not be

applied retroactively is ordinarily inapplicable to statues relating to remedies and forms of procedure, and which do not affect substantial rights. (*Hogan v. Bleeker* (1963), 29 Ill. 2d 181, 193 N.E.2d 844; see *People v. Myers* (1977), 44 Ill. App. 3d 860, 359 N.E.2d 197.) Also, a statute is not retroactive because it relates to an antecedent event if its application is actually invoked by an event occurring subsequent to its effective date. *People v. Valdez* (1980), 79 Ill. 2d 74, 402 N.E.2d 187.

■ The application of subsection 115—4(j) to the defendant's trial was not triggered by the murder which defendant committed. Rather, that subsection was invoked when defendant raised the insanity defense at trial. (*Cf. Valdez.*) Furthermore, defendant has not identified any substantive right which she accrued prior to the effective date of subsection 115—4(j) that was impaired by the application of that statutory provision. Nor has she pointed to anything which would support a holding that the application of subsection 115—4(j) attached a new disability with respect to the murder of which she was convicted. Even before the subsection became effective, persons convicted of crimes were subject to mental examinations and could have their probation conditioned on continued psychiatric treatment. Finally, this subsection did not serve as a bar to the defendant's raising any defense at her trial. For these reasons, we hold in this case that subsection 115—4(j) was not improperly applied as a retroactive law.

No error.

In sum, we find no merit in any of defendant's allegations of error.

Affirmed.

GREEN and TRAPP, JJ., concur.