THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOE N. WOODS, Defendant-Appellant.

Second District   No. 2—90—0365

Opinion filed March 4, 1992.—Rehearing denied April 8, 1992.

G. Joseph Weller and Kathleen J. Hamill, both of State Appellate Defender's Office, of Elgin, and James W. Buckley and James E. Wallis, both of Law Offices of James E. Wallis, of Granite City, for appellant.

Paul A. Logli, State's Attorney, of Rockford, and Joseph V. Roddy, of Law Offices of Joseph V. Roddy, of Chicago (William L. Browers, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE McLAREN delivered the opinion of the court:

Following a bench trial in the circuit court of Winnebago County, the court convicted defendant, Joe N. Woods, of residential burglary (Ill. Rev. Stat. 1989, ch. 38, par. 19—3(a)). The court subsequently sentenced him to nine years' imprisonment. On appeal, defendant contends that he was not proved guilty beyond a reasonable doubt of residential burglary and that he did not knowingly and understandingly waive his right to a jury trial. We affirm.

Darrell Price and his family returned from a camping trip at 9 a.m. on June 18, 1989, to discover that their house had been broken into. Entry had been gained through a bedroom window on the north side of the house. A jewelry box, some guns and some change kept in a fish bowl were missing. Price found a trail of change leading from the bedroom out the window, through the backyard and beyond a fence at the rear of the backyard. At trial, Price stated that he knew the defendant, who lived down the street from him. Defendant had never been inside Price's home, but it was possible that he had been near the outside of his home at times prior to the burglary. In fact, Price had seen defendant in the yard next door to his house on the south side less than nine days before the offense.

Police investigating the burglary discovered that the lower section of a double-hung window had been broken out. Broken glass was found on the ground outside the house. Officer John Genens opined that the glass had been taken out of the lower frame and placed on the ground by the perpetrator.

Defendant was arrested and charged by information with the burglary. On August 9, 1989, defendant's counsel filed a motion to appoint a psychologist to determine defendant's fitness to stand trial. The court granted the motion and appointed Frederick McNelly, Ph.D., to examine defendant.

At the subsequent fitness hearing, McNelly testified that defendant had a history of mental illness and was taking psychotropic medication on August 9, 1989. He found that defendant suffered from multiple substance abuse and schizophrenia disorganized. These conditions manifested themselves by an emotionally disturbed personality with irrational thinking. Defendant suffered from free flow thought disorders and had difficulty following a conversation.

McNelly further testified that defendant's mental capability was in the very low, borderline handicapped range. His functional IQ was in the low borderline range, which was in the educable mentally retarded range of skill. The State conceded that it could not prove fitness to stand trial at that time. The court found defendant unfit for trial.

On November 7, 1989, the court conducted a fitness status hearing. Defense counsel stipulated that defendant would score a 52 on a fitness examination, which is the minimum score necessary to be found fit for trial. The court accepted the stipulation and found defendant fit for trial.

Defendant later filed a motion to suppress statements he made to the police during their investigation of the burglary. Dr. McNelly again testified at the suppression hearing. McNelly testified that defendant's IQ was 75. This placed defendant in the range between mentally retarded and very low average. Defendant's reading and spelling abilities were below the first percentile. Defendant was a functional illiterate with a reading level below the third grade.

McNelly testified that reading comprehension skills range from a scale of 0 to 100 and an individual's oral reading skills are usually within one or two percentage points of his reading comprehension skills. The average person falls at 50 on the 0 to 100 scale. Defendant was between one and two on this scale.

McNelly further stated that defendant had regressed from January 1989 to August 9, 1989. His reading and spelling skills had not improved since January 1989. McNelly again stated that defendant suffered from schizophrenia. Based on this and other evidence, the court suppressed defendant's statements.

On January 12, 1990, defendant appeared in court, and the following colloquy occurred:

"THE COURT: Now, as to this charge you have an absolute right to have this charge against you tried before a jury of twelve people; do you understand?

DEFENDANT: Yes, sir.

THE COURT: All twelve people on that jury would have to be chosen from Winnebago County, Illinois, and all twelve would have to believe, after hearing all the evidence and arguments of the lawyers and the instructions of the Court, that you had been proved guilty of the particular crime charged beyond a reasonable doubt before they could find you guilty; do you understand?

DEFENDANT: Yes, sir.

THE COURT: You may waive or give up that right to a jury trial, only you can give it up. If you don't waive jury then you will have a jury trial. Your counsel informs me that you wish to waive or give up your right to jury trial; is that true?

DEFENDANT: Yes, sir.

THE COURT: That is do you want a bench trial by the Judge alone?

DEFENDANT: Yes, sir.

THE COURT: I would like to have you read out loud the sentence that appears above the signature line.

MR. WILT: Could I read it for him? He doesn't read too well, as you might recall from some of the testimony we had earlier, with the Court's permission.

THE COURT: Do you understand what that means?

DEFENDANT: Yes, sir.

THE COURT: Now, do you understand that if you sign that piece of paper you will be telling me that you do not want a jury trial, you want the Judge to try the case.

DEFENDANT: Yes, sir.

THE COURT: All right you can sign that. Now before I accept this, Mr. Woods, have you talked this over with your lawyer?

DEFENDANT: Yes, sir.

THE COURT: Have you talked this over with anybody else in your family that you might want to talk to?

DEFENDANT: I called my sister. She didn't come down here today. I don't know what's up."

On January 16, 1990, defendant again appeared in court, and the prosecutor and defense counsel announced a tentative plea agreement. At that time, the following conversation took place:

"THE COURT: Mr. Woods, I want you to read out loud the sentence that appears on that piece of paper above the signature line. Begin with the words, 'And now comes?'

DEFENDANT: 'And now comes the above named Defendant in his own—'

MR. WILT: 'Proper—,'

DEFENDANT: '—proper person and waives trial by jury in the above entitled cause and—,'

MR. WILT: 'enters—,'

DEFENDANT: 'enters a plea of guilty to residential burglary as—,'

MR. WILT: '—charged,'

DEFENDANT: '—as charged in the—'

MR. WILT: '—Information?'

DEFENDANT: '—Information.'

THE COURT: Now, Mr. Woods, if you sign that paper you will be doing two things. One, it says you will be giving up your right to a jury trial and actually you will be giving up your right to any trial; do you understand that?

DEFENDANT: Uh-huh.

THE COURT: And, second, you are pleading guilty to this charge of Residential Burglary under the terms of this agreement that provides that you will be sentenced to 7 years in the Department of Corrections.

DEFENDANT: Uh-huh.

THE COURT: Is that what you want to do?

DEFENDANT: Nope.

THE COURT: What do you want to do?

DEFENDANT: I am going to take a trial. I think I have a better chance at trial.

THE COURT: All right."

In the absence of a plea agreement the cause proceeded to a bench trial. In addition to the testimony of Price and the officers, the victim's father, Darrell Price, Sr., testified. He stated that he lived next door to his son. He was summoned to his son's home between 2 and 3 a.m., on June 18, 1989. As he arrived at the driveway he saw a man's head poke out of a window on the north side of the house. The elder Price yelled and the man took off. He was 20 to 30 feet from the window when the man ran off. Price was not able to identify the man he saw run from the window, but stated that as far as he could tell he was a black man, about 5 feet 8 inches to 5 feet 10 inches tall and slender, with short hair.

At trial, several officers testified regarding fingerprints lifted from the broken glass. A print taken from the glass matched the print of defendant's left middle finger. There were 10 points of identification between the print on defendant's fingerprint card and the print taken from the glass. A minimum of eight points is considered a positive match.

At the close of the State's case, defendant moved for a "directed judgment [*sic*]." The court characterized the motion as a motion for a "directed verdict [*sic*]" and denied the motion. (Ill. Rev. Stat. 1989, ch. 38, par. 115—4(k).) The defense rested without presenting any evidence. The court found defendant guilty of residential burglary. The

court denied defendant's post-trial motion and subsequently sentenced him to nine years' imprisonment.

Defendant raises two contentions on appeal. First, he argues that he was not proved guilty beyond a reasonable doubt of residential burglary because the only evidence linking him to the crime was his fingerprint on the broken glass and the State failed to prove that the print could not have been placed there at some time other than the time of the burglary. Defendant also contends that, given his low IQ, illiteracy and mental illness, the record does not establish that he made a knowing and understanding waiver of his right to a jury trial.

Regarding defendant's first issue, the evidence was sufficient to prove him guilty beyond a reasonable doubt. The State does not contest that the case against defendant is entirely circumstantial. However, circumstantial evidence is sufficient to support a conviction if, " 'viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis omitted.) *People v. Young* (1989), 128 Ill. 2d 1, 49, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 318-19, 61 L. Ed. 2d 560, 573-74, 99 S. Ct. 2781, 2788-89; *People v. Pintos* (1989), 133 Ill. 2d 286, 291.

A conviction may be based solely upon fingerprint evidence. (*People v. Rhodes* (1981), 85 Ill. 2d 241, 249; *People v. Taylor* (1965), 32 Ill. 2d 165, 168.) "In order to sustain a conviction solely on fingerprint evidence, fingerprints corresponding to the fingerprints of the defendant must have been found in the immediate vicinity of the crime under such circumstances as to establish beyond a reasonable doubt that the fingerprints were impressed at the time the crime was committed." *Rhodes*, 85 Ill. 2d at 249.

The facts of *In re P.W.*, a case consolidated with *Rhodes* for appeal, are similar to those of the instant case. In that case, the minor's fresh thumbprint was found on a glass fragment at the scene of the burglary. There was no other evidence connecting him with the break-in. The court affirmed the finding of delinquency based on residential burglary. The court concluded that "[i]t is not reasonable to hypothesize that the minor would casually walk past the window and impress a thumbprint on the right corner of the window." (*Rhodes*, 85 Ill. 2d at 250.) Thus, the presence of the thumbprint on the window was not consistent with any reasonable hypothesis of innocence. *Rhodes*, 85 Ill. 2d at 249-50; see also *People v. Reno* (1975), 32 Ill. App. 3d 754, 758.

■ Similarly, in the instant case, defendant's fingerprint was found on a piece of broken glass immediately outside the window through which entry was gained. Defendant speculates that, since he

lived in the neighborhood, and in fact was seen near the victim's home a few days before the burglary, the fingerprint could have been impressed at some other time. However, there was no evidence to support such a theory. Neither defendant nor anyone else testified that he had been near the north side of the victim's house. Although he was seen in a neighbor's yard adjacent to the victim's home, the yard was on the south side of the house, while the break-in occurred through a window on the north side. There was absolutely no evidence that defendant was ever on the north side of defendant's house at some time other than the crime.

The cases which defendant cites in support of his argument are distinguishable in that there was *some* evidence that each of the defendants had been in the victim's home at a time other than during the commission of the offense. See *People v. Poole* (1981), 99 Ill. App. 3d 939; *People v. Ware* (1980), 82 Ill. App. 3d 297; *People v. Donahue* (1977), 50 Ill. App. 3d 392.

Defendant's fingerprint was found on a piece of glass from the window through which entry was gained. As in *Rhodes*, it is simply not reasonable to hypothesize that defendant may have casually impressed his print on the window at some other time, particularly in light of the lack of evidence that he had ever been near the south side of the victim's house. The trial court was not required to raise this speculation to the level of reasonable doubt. There was sufficient evidence to support defendant's conviction beyond a reasonable doubt.

Turning to defendant's second issue, it is clear that he validly waived his right to a jury trial. Both the Illinois (Ill. Const. 1970, art. I, §8) and Federal constitutions (U.S. Const., amends. VI, XIV) guarantee a criminal defendant's right to trial by jury. The trial court has a duty to ensure that a defendant's waiver of that right is made expressly and understandingly. (*People v. Smith* (1985), 106 Ill. 2d 327, 334; *People v. Steenbergen* (1964), 31 Ill. 2d 615, 617.) The legislature has effectuated this right by statute, providing that "[e]very person accused of an offense shall have the right to a trial by jury unless understandingly waived by defendant in open court." (Ill. Rev. Stat. 1989, ch. 38, par. 103—6.) However, there is no set formula for determining whether the waiver was made knowingly, and the determination necessarily turns on the particular facts of each case. (*Smith*, 106 Ill. 2d at 334; *People v. Steiger* (1991), 208 Ill. App. 3d 979, 981.) There is no requirement that the court affirmatively advise defendant of his right to a jury trial and elicit a waiver, or advise him of the consequences of a waiver. *People v. Frey* (1984), 103 Ill. 2d 327, 333.

◼ Defendant contends that, due to his mental condition, his illiteracy, his inability to communicate effectively and his use of psychotropic drugs, he did not make an understanding waiver of his right to a jury trial in open court on January 12, 1990. The record reveals that on January 12 the trial court carefully explained to defendant his right to a jury trial and the consequences of waiving that right. When asked if he understood this right and wished to waive a jury trial, defendant repeatedly responded, "Yes, sir." Defendant also responded affirmatively when asked if he had discussed this with his attorney and said that he had also called his sister. Defendant's attorney read the jury waiver form and explained it to him. Defendant signed the form in open court. At no time did he demonstrate any confusion or misunderstanding regarding the right to a jury trial or his decision to waive that right.

◼ Defendant further contends, however, that even if he validly waived his right to a jury trial on January 12, he subsequently withdrew that waiver at the January 16 guilty plea hearing. Specifically, defendant points to the following colloquy as showing that he revoked his waiver:

"THE COURT: Now, Mr. Woods, if you sign that paper you will be doing two things. One, it says you will be giving up your right to a jury trial and actually you will be giving up your right to any trial; do you understand that?

DEFENDANT: Uh-huh.

THE COURT: And, second, you are pleading guilty to this charge of Residential Burglary under the terms of this agreement that provides that you will be sentenced to 7 years in the Department of Corrections.

DEFENDANT: Uh-huh.

THE COURT: Is that what you want to do?

DEFENDANT: Nope.

THE COURT: What do you want to do?

DEFENDANT: I am going to take a trial. I think I have a better chance at trial.

THE COURT: All right."

There is no indication in this sequence that defendant revoked his waiver of a jury trial. The court explained to defendant that he would be pleading guilty. The court's question, "Is that what you want to do?" clearly refers to pleading guilty. When defendant answered "Nope," he meant that he did not wish to plead guilty. He said nothing about a jury trial. No mention was made of a jury trial during the entire sequence. Given defendant's unequivocal waiver of a jury trial

just four days earlier, it is not reasonable to infer that defendant's one-word response, "Nope," somehow referred to waiving his right to a jury trial.

Moreover, this passage undermines defendant's claim that he was incapable of waiving his right to a jury trial due to his mental condition. His response that he thought he would have a better chance at trial shows an ability to appreciate the consequences of his actions and make a reasoned decision.

■ Generally, evidence that a defendant has been found fit to stand trial is sufficient to support a finding that he is competent to waive his right to a jury trial, especially where there is no conflict in the psychological testimony. (*People v. Marshall* (1983), 114 Ill. App. 3d 217, 231.) In *Marshall*, defendant was found guilty but mentally ill of murder in a bench trial. The defendant had previously been found fit to stand trial. The court held that where there was no conflict in the psychiatric testimony at the fitness hearing and no evidence that defendant's condition had deteriorated since the hearing, the evidence of fitness for trial also supported a finding that defendant was competent to waive a jury trial. Also, the court gave defendant a long admonition regarding her right to a jury trial. Defendant's responses showed that she understood this right and made a knowing decision. *Marshall*, 114 Ill. App. 3d at 231-32.

Similarly, in the instant case, defendant had recently been found fit to stand trial. Defense counsel stipulated that defendant would score at least a 52 on a fitness test. Dr. McNelly's testimony at the original fitness hearing and the suppression hearing was uncontradicted. There was no evidence that defendant's condition had deteriorated since those earlier proceedings. Finally, the court conducted a detailed admonition during which it explained the right to a jury trial and the consequences of waiving a jury. Throughout the admonition defendant responded appropriately to the court's inquiries, demonstrating that he understood the right and had made a knowing decision to waive it. In short, the record affirmatively shows that defendant understood the right to a jury trial, made a knowing decision to waive that right, and did not subsequently revoke that decision.

For the foregoing reasons, defendant's conviction and sentence for residential burglary are affirmed.

Affirmed.

DUNN and NICKELS, JJ., concur.