THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
PAUL CHATMAN, Defendant-Appellant.

First District (5th Division)    No. 85—0095

Opinion filed June 13, 1986.

Burton A. Brown and Wayne G. Nelson, both of Law Offices of Burton A. Brown, P.C., of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry, Peter D. Fischer, and Mary Beth Kinnertk, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LORENZ delivered the opinion of the court:

Following a bench trial defendant, Paul Chatman, was found guilty of murder, armed violence, and armed robbery. The trial court merged the armed-violence conviction into the murder conviction and sentenced defendant to serve concurrent extended terms of 75 years for murder and 40 years for armed robbery. On appeal defendant contends that the State failed to prove beyond a reasonable doubt that he was sane at the time he committed the offenses and that the extended-term sentence for murder was inappropriate.

Shortly after 11 a.m. on Friday, October 28, 1983, defendant beat to death 66-year-old Vera Kibby with a baseball bat and then stole her purse and automobile. The day before the killing, defendant, who was 17 years old, told his 16-year-old friend Steven Harris that he was going to steal Mrs. Kibby's money and her car and then sell the car. Defendant admitted to Harris that what he was contemplating was wrong.

Harris was a good friend of defendant and had known him for

five years. In the year before the killing, Harris and defendant saw each other at least four days each week and they played football and baseball together. Harris did not notice any unusual physical characteristics about defendant. He described defendant as slightly overweight but he did not consider him to have overly large breasts. Harris, however, never saw defendant play sports without wearing a shirt. Defendant had a bad temper and would become angry when "things didn't seem to go right." Harris did not notice anything unusual about defendant's mannerisms or speech on October 27, 1983. In Harris' opinion defendant was sane when he spoke with him the day before the killing but he could not define "sane" or "insane." Harris explained that he could tell whether someone was "crazy" by his actions.

At approximately 7:45 a.m., on Saturday, October 29, 1983, Vera Kibby's purse was found wrapped in a garment bag inside of a garbage can in an alley several miles from her home. There was no money in the purse. The victim's body was found in the front room of her home shortly after 11 a.m. on October 29, 1983. The parties stipulated that she had died of injuries to the skull and brain caused by blunt force applied to the back of the head. The victim's Chevrolet Caprice was missing as well as her car keys and her purse. The police recovered the vehicle early in the afternoon of October 29, 1983, and arrested the driver, Craig Long, and the passenger, Alfred Lewis.

Long testified that early in the evening on Friday, October 28, 1983, defendant came over to his home and told him that he had stolen a car which he had parked one block from Long's house. Defendant enlisted Long's help in trying to find a "chop shop" where they could dispose of the stolen vehicle. When they could not find one, Long, at defendant's suggestion, parked the car two blocks from defendant's home. Defendant then admitted to Long that he had killed an old lady and had taken $40 and her car. The woman was his mother's best friend.

Defendant explained to Long that he had disguised himself by wearing a trenchcoat and a hat and had brought additional clothing in a bag. Defendant repeatedly struck Mrs. Kibby on the head with a baseball bat to prevent her from surviving and identifying him. Defendant then changed his clothes because he had gotten blood on his pants. Defendant took the victim's purse, containing $40, and the keys to her car. When he saw a red light on an alarm system on the wall, defendant was frightened and ran out of the house.

Defendant showed Long the money he had taken but he refused to tell him what he did with the purse. According to Long, defendant

said that he had burned the baseball bat which had bloodstains on it and that he had thrown the bat into his next-door neighbor's yard. After this conversation, defendant and Long drove the victim's car to 90th and Cornell where defendant visited his girl friend. Defendant returned to the vehicle, drove it to the vicinity of his high school, and walked home.

Long, who was 16 years old, had known defendant for about six years and considered him to be a close friend. He saw him almost every day and played football and baseball with him. In Long's opinion defendant spoke coherently, acted normally and, judging by his actions, was sane on October 28, 1983. Long had seen defendant when he was not wearing a shirt, and he had noticed nothing unusual about defendant's physical appearance. He had never heard that defendant was self-conscious about the size of his breasts. Defendant occasionally argued with his mother and threw temper tantrums.

The police recovered a charred baseball bat from the backyard of defendant's next-door neighbor's house. The bat was found in the rear of the lot in an area overgrown with weeds, bushes, and trees. The parties stipulated that the blood on the bat had the same antigens as the victim's.

Defendant was arrested when he arrived home at 4 p.m. on October 29, 1983. He was advised of his *Miranda* rights, which he acknowledged that he understood, and was transported to the area police station. At 7:15 p.m. defendant, after again being advised of and waiving his *Miranda* rights, agreed to give a statement. Defendant gave an oral confession to Assistant State's Attorney Georgia Buglass and Investigator Albert Wolf. This interview lasted approximately 30 minutes and was tape recorded. The tape has not been included in the record on appeal. Defendant agreed to give a court-reporter statement which was taken from 8:15 to 8:30 p.m. After the 14-page statement was transcribed, defendant read the statement, made numerous corrections thereon, and signed each page.

In the statement defendant said he had known Vera Kibby for several years and had mowed her lawn. Although Kibby was his mother's friend, defendant resented her because she interfered in conversations he had with his mother. Defendant described Kibby as arrogant but crossed out that adjective when he later reviewed and corrected the statement.

On Friday morning, October 28, 1983, defendant decided to go to Kibby's home to get some money he needed to take a girl out on a date Saturday night. The date had been arranged two days earlier. Defendant brought a baseball bat with him to scare Kibby into telling

him where she kept her money. He carried the bat in a bag where it could not be seen. Defendant wore a skull cap so that the neighbors would not be able to recognize him. He admitted wearing two pairs of jeans but he could not explain why. In the earlier oral statement, defendant said that he had worn two pairs of pants because he thought one pair might get dirty.

Defendant left his home at 11 a.m. and took two buses to get to Kibby's home. Defendant rang the doorbell and Kibby answered the door. When she did not immediately recognize him, defendant said, "It's me, Paul." Defendant asked if he could use her telephone, and she admitted him into her home. No one else was present. Kibby made one telephone call to complain about her newspaper delivery service and then went into the bathroom. Defendant was in the front room. While Kibby was in the bathroom, defendant removed the baseball bat from the bag and placed it in a hallway by the side of the door so that Kibby could not see it when she returned.

Kibby walked back into the front room and made another telephone call. When Kibby completed her call, defendant was facing her back. Her purse was in front of her and she was fumbling with something. Defendant reached for the baseball bat and approached Kibby from behind with the bat in his hand. Kibby then backed into defendant and bumped him. Defendant raised the bat over his head and swung down, hitting Kibby either on the head or on the side of the neck. Defendant was not sure whether Kibby fell after the first blow but he recalled that she mumbled something and that her voice sounded groggy. Defendant raised the bat again, paused momentarily, then struck her on the head. Kibby was still moving after the second blow. Defendant waited briefly while Kibby was moving and then took her car keys, which had fallen to the floor, and her purse. Defendant denied that he had planned to take her car when he went to her home.

Defendant left Kibby's home and took her automobile. After removing the $41.50 that was in the purse, defendant placed the purse and the outer pair of jeans he had been wearing into the bag. The jeans had blood on them. Defendant stated that he threw the bag containing the purse and jeans out of the vehicle on South Chicago Avenue near Jeffrey. Defendant drove the victim's car to his home and parked it in the garage, leaving the keys in the ignition. Later defendant moved the car to an abandoned garage near his home. After he moved the car, he walked to Craig Long's home. Defendant admitted that he had told Long about the car. Defendant remembered that Long had helped him to find the keys to the car which defendant had

lost because he was so nervous. He also remembered driving with Long to his girlfriend's house, then leaving the car near his high school. In the earlier oral statement defendant also mentioned that he had burned the baseball bat and that he had told Long that he had killed the victim.

Both Buglass and Wolf testified that defendant appeared to be normal and that he gave responsive answers to their questions. Defendant was alert and cooperative and he exhibited no signs of being under the influence of alcohol or drugs. His speech was clear and coherent. Neither Buglass nor Wolf noticed anything unusual about defendant, his physical appearance, his mannerisms, or his speech. Buglass testified that defendant did not refer to his concerns about the size of his breasts. Defendant never mentioned using drugs, hearing voices, or seeing visions. Based upon their everyday experiences, their observations of defendant, and their conversations with him, Buglass and Wolf stated that, in their opinions, defendant was sane on October 29, 1983.

Defendant's insanity defense was based on the testimony of Dr. William S. Bradbury, a psychiatrist who treats 50 to 75 patients per year. At defense counsel's request, Dr. Bradbury interviewed defendant on February 2, 1984, and again on February 7, 1984. Each session lasted 45 minutes. Dr. Bradbury also interviewed the defendant's parents, reviewed the police reports, read defendant's transcribed confession, and listened to the tape recording of his earlier, oral confession. In formulating his opinion on defendant's sanity, Dr. Bradbury did not consider the reports of the psychiatrists and psychologists associated with the Psychiatric Institute of the circuit court of Cook County or the medical reports from Cermak Hospital and Little Company of Mary Hospital.

Dr. Bradbury noticed that defendant was "definitely overweight" and had "very markedly enlarged breasts," which made him extremely self-conscious. Defendant's friends teased him about his physical appearance, which defendant attempted to conceal by wrapping a large bandage around his chest to flatten his breasts and by wearing loose-fitting shirts. Defendant never removed his shirt in front of anyone. Defendant asked his parents to consider having the size of his breasts surgically reduced.

Dr. Bradbury related defendant's complaint that since the beginning of junior high school he had experienced auditory hallucinations. Defendant heard voices calling him fat, a woman, "Pauline," and telling him to kill or hurt himself. The voices tormented defendant to the point where he did not know whether he is male or female. Defendant

also suffered from the delusion that he had a vagina which he wanted to have removed surgically. Dr. Bradbury attributed this condition to a thought disorder, that defendant's reasoning was quite illogical and bizarre. Defendant was paranoid and frequently psychotic.

Dr. Bradbury testified further that defendant used PCP (phencyclidine), an hallucinogenic drug, in an attempt to control the intensity of his auditory hallucinations. According to Dr. Bradbury, defendant developed a tolerance for PCP and had to ingest ever greater quantities to control his hallucinations. Ultimately, the drugs had virtually no effect on the voices defendant heard. Defendant developed suicidal tendencies because he was tormented by his illogical thinking, he could not form meaningful relationships with other persons, and he was urged to kill himself by the voices he heard. Defendant was controlled by those voices.

In Dr. Bradbury's opinion defendant was suffering from schizophrenia, paranoid type, and at times was grossly psychotic, that he was out of touch with reality and unaware of what he was doing or the circumstances surrounding his actions. According to Dr. Bradbury, at the time of the incident defendant did not know what he was doing and did not know right from wrong. Defendant told Dr. Bradbury that the voices ordered him to go to Kibby's house to get money to buy some PCP and to take the money if she would not give it to him freely. Although defendant may have realized that stealing is wrong, he could not resist or disobey the voices which were controlling his behavior. The last thing defendant could recall was striking the victim with a baseball bat. The voices told defendant to kill Kibby because she "would tell on him and he would get in trouble." At that point, according to Dr. Bradbury, defendant became totally psychotic and more or less blacked out, not realizing what he was doing or that it was wrong.

In Dr. Bradbury's opinion defendant, at the time of the incident, could not conform his conduct to the requirements of law because he was "totally psychotic, totally out of control, totally out of touch with reality and he was controlled, essentially, totally by the voices that he was experiencing." It was consistent with his diagnosis that defendant could later recall what had happened. It was possible but highly unlikely that defendant would have appeared to have been normal before and after the crimes were committed. Defendant would have been extremely agitated. Even the day after the crime, defendant would not have seemed to have been normal to a trained observer. In Dr. Bradbury's opinion defendant was not faking. He explained that it would have been impossible for someone without special training to

present a consistent pattern of symptoms of schizophrenia. Dr. Bradbury had no doubt that defendant was and is tormented by his auditory hallucinations.

On cross-examination Dr. Bradbury acknowledged that he was familiar with studies indicating that symptoms of psychosis may be feigned. He did not believe, however, that defendant was malingering or lying. Defendant's case was the first criminal trial in which Dr. Bradbury testified. Other than defendant he had never examined anyone awaiting trial. Dr. Bradbury admitted that his diagnosis of defendant depended in large part upon defendant telling him the truth.

Dr. Bradbury testified that if a person is hearing voices, does not know what is going on around him and is totally out of touch with reality, he is not fit to stand trial. In his written report, however, Dr. Bradbury concluded that defendant understood the charges and proceedings against him and was able to cooperate with his lawyer in his defense even though, at the time of his interviews, defendant "was still hallucinating and psychotic, very suicidal and potentially homicidal."

Dr. Bradbury expressed the opinion that defendant's close friends might not have noticed his unusual behavior because defendant tried to conceal it from them and because they might not want to believe that defendant's conduct was irrational. It was not uncommon for overweight males to have enlarged breasts. Dr. Bradbury believed that the ingestion of PCP usually would intensify not lessen auditory hallucinations. Defendant told Dr. Bradbury that the morning after the killing he took some PCP because his voices were telling him to hang himself. The voices then subsided and went away. Dr. Bradbury acknowledged that defendant's parents had told him that defendant had a bad temper and that he always wanted to have his own way.

In Dr. Bradbury's opinion it was consistent but illogical for defendant to try to get money to buy drugs. He did not believe defendant when defendant told him that he spent "hundreds of dollars a week" to buy drugs. He characterized this statement as hyperbole. Defendant told Dr. Bradbury that he was acting on a sudden impulse when he went to get money from Mrs. Kibby and that he recalled few details of the incident.

In Dr. Bradbury's opinion evidence that defendant had planned the crime would indicate that, at that moment, he understood the difference between right and wrong even if he was hallucinating. On further cross-examination Dr. Bradbury conceded that defendant's actions in removing the money from the victim's purse, disposing of

the purse and the bloodied clothes, burning the murder weapon and fleeing from the house when he saw the light on a burglar alarm system could have indicated that defendant appreciated the criminality of his conduct. Dr. Bradbury expressed the opinion that defendant was psychotic "for probably over a day," or at least "half of a day, 12 hours." When questioned regarding defendant's efforts to dispose of the evidence on the day of the offense Dr. Bradbury stated that it was "possible" that defendant was not psychotic but only "intermittently psychotic."

Defendant's mother, Charlotte Elaine Chatman, also testified in his defense. Mrs. Chatman related various incidents in defendant's childhood when he exhibited violent and angry behavior. Defendant was extremely forceful and often could not explain his conduct. He received some counseling for his problems. Because of his apprehensions regarding his physical appearance and his athletic abilities, defendant lost all interest in sports. Mrs. Chatman denied that Craig Long was a close friend of her son. She was not aware of defendant using any drugs other than marijuana, although, because of defendant's erratic behavior, she often suspected that defendant was using other drugs.

On cross-examination Mrs. Chatman stated that defendant resented the amount of time Mrs. Kibby spent at their home and felt that his privacy was being invaded. She admitted that she had told someone at the Psychiatric Institute that defendant had been indulged by the family and that he always had problems with persons saying no to him. Mrs. Chatman did not notice any suicidal or homicidal tendencies in her son.

In rebuttal the State called Dr. Albert Stipes, a psychiatrist employed by the Psychiatric Institute of the circuit court of Cook County. Dr. Stipes had interviewed approximately 2,500 patients in the four years he had been associated with the Psychiatric Institute. In 1983 Dr. Stipes interviewed approximately 750 patients to determine their fitness to stand trial, their sanity at the time of the offense or both.

In Dr. Stipes' opinion defendant was sane at the time of the crimes. This opinion was based upon a one-hour interview of defendant on December 16, 1983, and a review of the records of Dr. Peron, a psychologist, and Dr. Baker, a psychiatrist, both of whom had interviewed defendant, a social history prepared by a psychiatric social worker who had interviewed defendant's parents, defendant's medical records from Cermak Hospital and Little Company of Mary Hospital, the police reports, defendant's transcribed confession and the tape recording of his earlier, oral confession.

Dr. Stipes diagnosed defendant as having an identity disorder of adolescence coupled with mixed substance abuse. He defined an identity disorder as a common adjustment disorder occurring in childhood and adolescence in which a person has difficulty forming either a sexual or social identity. Mixed substance abuse refers to a person's periodic use of intoxicating substances such as drugs.

In Dr. Stipes' opinion defendant's efforts to conceal his identity, dispose of incriminating evidence, and avoid apprehension reflected an appreciation of the criminality of his conduct. Defendant's planning of the crimes indicated that he was able to conform his conduct to the requirements of law. Dr. Stipes found no evidence of schizophrenia or psychosis. Defendant's belief that he might be a woman was not an unusual obsessional thought in a disturbed adolescent and would not necessarily suggest that he was psychotic. Defendant's conduct was not consistent with a diagnosis of paranoid schizophrenia because he proceeded in a logical manner with a particular motive in mind. Dr. Stipes found that Dr. Bradbury's conclusion in his written report that defendant was both psychotic and fit to stand trial was inconsistent. A psychotic, by definition, is not in contact with reality and would not be able to follow or understand the proceedings in court or cooperate with defense counsel. Defendant was narcissistic and dependent. In common parlance defendant was spoiled and had temper tantrums when he did not get his own way.

Based upon his interview of defendant and his extensive experience in interviewing other criminal defendants, Dr. Stipes concluded that defendant was malingering, faking, or exaggerating symptoms of a disease. This also represented the opinion of Dr. Peron and of the doctors who treated defendant at Cermak Hospital.

Dr. Stipes stated the defendant insisted on presenting to him the symptoms of his alleged hallucination and his past history. Essentially, defendant was begging Dr. Stipes to believe him. Two days before he was interviewed by Dr. Stipes defendant told Dr. Peron that he did not hear voices. When Dr. Stipes asked defendant whether he heard the voices with his ears or inside of his head, defendant became very evasive and refused to answer his question. Dr. Stipes explained that hallucinations are sensory and that if defendant had been psychotic he would have heard the voices through his ears. Other signs of malingering included marked discrepancies among the various statements defendant gave to the police, Dr. Bradbury, and Dr. Stipes, including whether he had planned the crimes and whether he had taken any precautions to avoid being detected. Dr. Stipes also testified that if defendant actually believed that he was a woman he would have acted

out that delusion in some way.

While defendant was in custody he was administered Haldol, an antipsychotic drug used both for the treatment of schizophrenia and for drug psychosis. Haldol is commonly prescribed to control the effects of drugs such as PCP. Dr. Stipes testified that defendant's medical records indicated that he was given Haldol because of his suicidal tendencies.

After hearing closing arguments the trial court found defendant guilty of murder, armed violence, and armed robbery. The court merged the armed violence conviction into the murder conviction and sentenced defendant to serve concurrent extended terms of 75 years for murder and 40 years for armed robbery. This appeal follows.

I

Defendant initially contends that the State failed to prove beyond a reasonable doubt that he was sane at the time he committed the offense. We disagree.

A person is not criminally responsible for his conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. (Ill. Rev. Stat. 1983, ch. 38, par. 6—2(a).) If, as here, the defendant introduces evidence sufficient to raise the affirmative defense of insanity, the State must sustain the burden of proving the defendant guilty by establishing beyond a reasonable doubt that the defendant was sane at the time of the offense. (Ill. Rev. Stat. 1983, ch. 38, par. 3—2(b); *People v. Silagy* (1984), 101 Ill. 2d 147, 168, 461 N.E.2d 415.) To meet this burden the State is not required to produce expert testimony regarding defendant's sanity but may rely on facts in evidence and the inferences which the trier of fact may draw therefrom. (*People v. Marshall* (1983), 114 Ill. App. 3d 217, 226, 448 N.E.2d 969.) The existence of a plan or design for a crime, especially for escape and prevention of detection or concealment of the crime, has been held to be a factor of particular relevance to a defendant's insanity. (See *People v. Teague* (1982), 108 Ill. App. 3d 891, 903, 439 N.E.2d 1066, and the cases cited therein.) Here the evidence of such a plan, which we have set out above, was compelling. Defendant's actions clearly reflected the appreciation of the criminality of his conduct and manifested an ability to conform his conduct to the requirements of law. See *People v. Silagy* (1984), 101 Ill. 2d 147, 169-70, 461 N.E.2d 415.

The State also presented the lay opinions of four witnesses

regarding defendant's sanity. Nonexperts who have had an opportunity to observe a person may give their opinions of his mental condition or capacity based on facts observed, including conversations with him. To render such opinions admissible, they must be limited to conclusions drawn from the specific facts to which they testified. (*People v. Teague* (1982), 108 Ill. App. 3d 891, 903, 439 N.E.2d 1066.) Whether sufficient facts and circumstances have been testified to is within the discretion of the trial court and absent an abuse of discretion, its determination will not be reversed on appeal. 108 Ill. App. 3d 891, 903, 439 N.E.2d 1066.

■ Upon our review of the record we are satisfied that each of the four lay witnesses had an adequate basis on which to express an opinion as to defendant's sanity. Although defendant argues that these opinions do not relate to the time of the crimes, we note that lay opinions based on observations made shortly before and after a crime that a defendant appears to be normal are admissible on the issue of the defendant's sanity at the time of the crime and may overcome an expert opinion that the defendant was insane. See *People v. Brown* (1982), 104 Ill. App. 3d 1110, 1114, 1117, 433 N.E.2d 1081; *People v. Bloodworth* (1979), 68 Ill. App. 3d 341, 349, 385 N.E.2d 904; *People v. Arnold* (1974), 17 Ill. App. 3d 1043, 1048-49, 309 N.E.2d 89.

Finally, the State offered the expert testimony of Dr. Albert Stipes to rebut the testimony of Dr. William Bradbury, the defense expert witness. In deciding the question of sanity, the trier of fact may accept one expert's opinion over another. (*People v. Taylor* (1982), 110 Ill. App. 3d 112, 118, 441 N.E.2d 1231; *People v. Clark* (1981), 102 Ill. App. 3d 414, 421, 429 N.E.2d 1255.) In the case at bar, the trial court reasonably could have rejected Dr. Bradbury's opinion regarding defendant's sanity in favor of Dr. Stipes' opinion.

The weight to be afforded an expert's opinion as to a defendant's sanity is to a great extent dependent on the factual details which the expert provides to support his opinion. (*People v. Marshall* (1983), 114 Ill. App. 3d 217, 226, 448 N.E.2d 969; *People v. Teague* (1982), 108 Ill. App. 3d 891, 899, 439 N.E.2d 1066.) Here, as in *People v. Greenfield* (1975), 30 Ill. App. 3d 1044, 1048, 333 N.E.2d 36, the opinion of the defense psychiatrist assumed the truth of what defendant related to him. A careful review of the evidence, however, indicates that defendant was not truthful.

The defendant told Dr. Bradbury that he had been hearing voices since he was in junior high school. Other than one remote, uncorroborated instance referred to in Dr. Bradbury's report, however, there is no evidence in the record that defendant had mentioned these audi-

tory hallucinations to anyone, including his mother and any of the mental health professionals he had seen, before he was interviewed by various psychiatrists following his arrest. When defendant was interviewed by Dr. Peron from the Psychiatric Institute, he denied hearing voices. Dr. Stipes believed that defendant was malingering which also represented the opinions of Dr. Peron and the doctors who treated defendant at Cermak Hospital. These opinions were supported by defendant's refusal to tell Dr. Stipes whether he heard the voices in his head or through his ears. Although defendant claimed that he used PCP (phencyclidine) to control the intensity of his auditory hallucinations, Dr. Bradbury acknowledged that PCP, an hallucinogenic drug, usually would intensify such hallucinations. Dr. Bradbury did not believe defendant's claim that he spent hundreds of dollars each week on drugs. Defendant told Dr. Bradbury that by the time of the killing the PCP had no effect on his voices. And yet defendant claimed that on the morning after the killing he took PCP and the voices went away.

Defendant also told Dr. Bradbury that he was very self-conscious about his enlarged breasts and was confused about his sexual identity. None of the State's witnesses, however, including two of defendant's closest friends, noticed anything unusual about defendant's physical appearance. And Dr. Bradbury admitted that it is not uncommon for overweight males to have enlarged breasts. With regard to defendant's belief that he is a woman, there is no evidence that defendant mentioned this delusion to anyone or that he acted out of this delusion. Dr. Bradbury's report indicated that defendant had been dating a girl steadily for six months. Other evidence established that defendant went to this girlfriend's house on the same day of the killing and that, prior to the killing, he had made a date with her to see a musical on the day after the killing.

In his interview with Dr. Bradbury, defendant's recollection of the details of the killing was vague and what details he did recall were contradicted by his statements to Steven Harris, Craig Long, Investigator Wolf and assistant State's Attorney Buglass. Dr. Bradbury thought it was very unlikely that defendant would have appeared to have been normal after the killing. Yet Craig Long noticed nothing unusual about defendant afterwards nor did Wolf or Buglass.

Dr. Bradbury admitted that evidence that defendant had planned the crime, removed the money from the victim's purse, disposed of the purse and the bloodied clothes, burned the murder weapon, and fled from the scene when he saw a light on the burglar alarm system were actions that were consistent with defendant's appreciation of the

criminality of his conduct.

Dr. Stipes, on the other hand, found no evidence of schizophrenia or psychosis. Defendant's conduct was not consistent with a diagnosis of paranoid schizophrenia because he proceeded in a logical manner with a particular motive in mind. Moreover, Dr. Bradbury's diagnosis was inconsistent with his finding that defendant was fit to stand trial. In Dr. Stipes' opinion, defendant's efforts to conceal his identity, dispose of incriminating evidence and avoid apprehension reflected an appreciation of the criminality of his conduct. Defendant's planning of the crimes indicated that he was able to conform his conduct to the requirements of law. We note further that Dr. Bradbury did not share Dr. Stipes' extensive experience interviewing criminal defendants and did not review all of the available medical reports and records before he rendered his opinion regarding defendant's sanity.

■ Whether a defendant was sane or insane when he committed an offense is a question for the trier of fact, whose finding will not be disturbed on review unless it is so improbable or unsatisfactory that it raises a reasonable doubt as to a defendant's sanity. (*People v. Ward* (1975), 61 Ill. 2d 559, 568, 338 N.E.2d 171.) Upon our review of the evidence in this case, we are unable to conclude that the trial court's finding that defendant was sane at the time he committed the offenses was erroneous.

## II

Defendant next contends that the 75-year extended-term sentence for murder was inappropriate. Again, we disagree.

■ An extended-term sentence may be imposed when a defendant is convicted of any felony and the court finds that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty or when a defendant is convicted of any felony committed against a person 60 years of age or older at the time of the offense. (Ill. Rev. Stat. 1983, ch. 38, par. 1005—5—3.2(b)(ii).) In the case at bar, the court found that defendant was eligible for an extended-term sentence on both grounds. Because it is undisputed that the victim was over 60 years of age, we need not determine whether the other ground was established.

Defendant beat to death a 66-year-old woman with a baseball bat and then stole her purse and her automobile. Defendant struck her repeatedly to ensure that she would not live to identify him. This was not a crime of passion. It was a cold, calculated murder and robbery of a woman defendant knew well, a woman whom defendant resented because of the time she spent with his mother, a woman whose death

would both satisfy defendant's desire to avenge himself for imagined slights and pay for a date with his girlfriend. Although defendant expressed remorse at the sentencing hearing, in his interview with Dr. Bradbury defendant stated that he did not know the victim well enough to feel sorry that she had died.

■■ We find no support in the record for defendant's assertion that the court did not consider factors in mitigation or defendant's rehabilitative potential. The requirement that the trial judge set forth his reasons in the record for the particular sentence imposed does not obligate the judge to recite and assign a value to each factor presented in evidence at the sentencing hearing. (*People v. Meeks* (1980), 81 Ill. 2d 524, 534, 411 N.E.2d 9.) The court, in imposing sentence, specifically acknowledged that it had considered the argument presented in mitigation and defendant's expression of remorse. In our judgment the trial court did not abuse its discretion in imposing an extended-term sentence on defendant for murder. None of the cases cited by defendant dictates a contrary result.

■■ We note, however, that the court also imposed an extended-term sentence for armed robbery. Under the supreme court's decision in *People v. Jordan* (1984), 103 Ill. 2d 192, 469 N.E.2d 569, this extended-term sentence for armed robbery was inappropriate. Accordingly, we reduce defendant's sentence for armed robbery to 30 years.

For the foregoing reasons, the judgment of the circuit court of Cook County, as modified, is affirmed. Pursuant to *People v. Nicholls* (1978), 71 Ill. 2d 166, 374 N.E.2d 194, we grant the State's request that defendant be assessed $50 as costs for defending this appeal and incorporate it as part of our judgment.

Affirmed as modified.

SULLIVAN, P.J., and MURRAY, J., concur.