THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROMAN CHAVEZ, Defendant-Appellant.

First District (4th Division)   No. 1—91—1954

Opinion filed June 16, 1994.

Rita A. Fry, Public Defender, of Chicago (Kyle Wesendorf, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Assistant State's Attorney, and Rebecca Davidson, Special Assistant State's Attorney, of counsel), for the People.

JUSTICE JOHNSON delivered the opinion of the court:

Defendant, Roman Chavez, was charged by indictment with first degree murder (Ill. Rev. Stat. 1989, ch. 38, par. 9—1), robbery (Ill. Rev. Stat. 1989, ch. 38, par. 18—1), and disarming a police officer (Ill. Rev. Stat. 1989, ch. 38, par. 31—1a). Following a jury trial in the circuit of Cook County, he was convicted of all charges and sentenced to life in prison without parole. Defendant appeals, alleging that (1) the trial court improperly excluded his post-arrest statements; (2) the

trial court wrongly excluded evidence of his mental condition; (3) the trial court erroneously tendered an instruction on the use of force by an initial aggressor; (4) the trial court improperly admitted certain evidence; and (5) the prosecution made several improper arguments during closing and rebuttal arguments which denied him a fair trial.

We affirm.

This case involves the shooting deaths of Chicago police officers Gregory Hauser and Raymond Kilroy. Defendant shot and killed the officers as they were responding to a 911 call from Florence Zuniga, defendant's 75-year-old grandmother. The circumstances surrounding the shooting as presented at trial are as follows.

On the evening of May 13, 1990, defendant was working on his car in his grandmother's garage located behind the Zuniga home at 2158 North Nordica in Chicago. The two-car garage was full of auto parts and other debris so that there was room for only one car. Ms. Zuniga asked defendant to remove his car so she could park her car in the garage and threatened to call the police if he refused. Defendant failed to comply and, after several exchanges, Ms. Zuniga went inside the house and called the police. As she left the garage, she noticed that the side door to the garage was unlocked.

Ms. Zuniga initially called a neighborhood police station and requested to speak with an officer who had previously visited the Zuniga home in response to a disturbance caused by defendant. She was informed that the officer was not on duty and was told to call 911. Ms. Zuniga then telephoned 911 and Officers Hauser and Kilroy responded to the call.

Immediately upon arriving at the Zuniga home, Officer Hauser radioed for a police wagon to help transport defendant to the police station. The two officers then spoke with Ms. Zuniga, who led them to the garage after she assured them she would sign a complaint. The officers entered the garage under the overhead door, which was partially lowered, while Ms. Zuniga went to the side door. As she approached the door, Ms. Zuniga observed the garage light go out. Ms. Zuniga then heard scuffling coming from inside the garage during which she heard defendant cry out for help. She then attempted to enter the side door, which was now locked.

At trial, Reverend Andrew Hagen and his wife, Susan Hagen, testified that on May 13, 1990, they lived across the street from the Zuniga home. On that date, Reverend Hagen was looking out of his living room window when he observed two officers arrive at the Zuniga home. As the officers approached the garage, they appeared very calm. After the officers entered the garage, Hagen heard noise coming from the garage. He also heard a voice cry out for help, and

when he looked out of his window, he saw Ms. Zuniga running toward the street. Hagen ran out to assist Ms. Zuniga and then heard six gunshots. Moments after he helped Ms. Zuniga to his house, Hagen saw defendant emerge from the garage holding a gun in the air. Defendant did not limp or appear to be injured. Hagen then heard defendant announce, "Everybody better leave me alone." Mrs. Hagen telephoned 911.

Shortly before 9 p.m. on May 13, 1990, Chicago police officers Bruce Pearson and Andre Souffant arrived at the Zuniga home 10 minutes after receiving Officer Hauser's request for a police wagon. Reverend Hagen called out to the officers that defendant was inside the house. Officer Souffant went to the house while Officer Pearson went to the garage. As he approached the garage, Pearson heard what he considered to be a groan or a growl. He then entered the garage where he found Officers Hauser and Kilroy lying six inches apart on the ground.

Officer Pearson approached the two officers and noticed that Hauser was breathing but Kilroy was not. He also noticed that Hauser's gun holster was pulled around in front of his crotch and his service revolver was missing. Pearson observed that although Kilroy's gun was fully loaded and in his holster with the safety tab intact, his handcuffs and flashlight were missing. Pearson then radioed for help and Hauser and Kilroy were taken to area hospitals where Kilroy was pronounced dead upon arrival. Hauser died later that evening.

Subsequently, police officers searched the Zuniga home and the surrounding area for several hours. At approximately 2 a.m., Officer Harold Bone found defendant hiding under a porch at 2310 North Harlem. Defendant resisted as Officer Bradul Ortiz pulled him out from under the porch area, which was full of debris. Defendant's hands and legs were cuffed and he was taken to the police station. Hours later, Officer Sarah McDermott recovered Hauser's fully loaded gun, which was buried under the porch beneath the debris.

Ginger Rogers testified at trial that sometime in June of 1990, she was in defendant's bedroom at his grandmother's house. She stated that while looking behind defendant's dresser she observed a pair of handcuffs lying inside some clothing. Rogers also looked through defendant's dresser drawers where she found a box containing a bullet and keys to the handcuffs.

Dr. Metra Kalelkar testified at trial that she performed autopsies on the bodies of Officers Hauser and Kilroy and determined that each had suffered three gunshot wounds. She stated that Kilroy was shot once in his neck, and two bullets perforated his lungs. Dr. Kalelkar traced the paths of the bullets and concluded that all shots

fired at Kilroy were fired from his left to right, indicating the gun was to the left of the officer.

In further testimony, Dr. Kalelkar stated that Officer Hauser suffered a gunshot wound to his head, his right armpit and right forearm. According to Dr. Kalelkar, the wounds to Hauser's head and armpit indicated that he was shot from close range. Dr. Kalelkar traced the path of the bullet wound to Hauser's forearm and noted that the injury would be consistent with Hauser either being seated on the floor or leaning toward the gun at the time he was shot. Dr. Kalelkar offered no opinion as to the order of the shots which killed the officers except that the gunshot to Hauser's head was the last wound inflicted. The cause of death of both officers was multiple gunshot wounds.

Chicago police firearm expert Richard Chenow testified at trial that he analyzed the slain officers' guns and the bullets recovered from the Zuniga garage after the shooting. Chenow stated that all of the spent casings found in the garage were fired from Officer Hauser's gun and that Kilroy's gun had not been fired. A discharged shell casing found in defendant's bedroom after the shooting was the same as the spent casings found in the garage. Chenow further testified that he examined the clothing worn by the slain officers. Based on his examination, Chenow determined at least one of the gunshots which hit Kilroy was fired at close range. He examined the entrance and exit holes on the officers' clothing and was able to trace the path of the bullets.

Also at trial, over defendant's objection, the State presented evidence concerning defendant's previous arrests. Northlake police officer Jack Monticello testified that on January 26, 1990, he arrested defendant for speeding, failing to stop, and operating a vehicle without insurance. According to Monticello, defendant later failed to appear in court and a warrant was issued for his arrest. Northlake police officer Domenico Rossi testified that on March 26, 1990, he and his partner, Robert Fazzi, arrested defendant based on the warrant. The officers took defendant to the police station, where he threatened the officers stating that if he had a gun, he would kill all of them.

Elmhurst police officer Paul Carney testified that on February 7, 1990, he stopped defendant for speeding. After speaking with him, the officer learned that defendant was driving without insurance and ordered him from his car. However, defendant reached for his ignition keys and attempted to start his car. When the officer reached inside defendant's car to grab the keys, defendant rolled up the car window and locked the officer's arm between the window and the door frame. Officer Carney pulled his arm free and defendant drove off. Defen-

dant was apprehended a short time later and taken to the police station where he was arrested. Defendant was released on his own recognizance and given a court date. However, defendant failed to appear in court on March 19, 1990, and a warrant was issued for his arrest. According to Officer Carney, the warrant was still active on May 13, 1990.

Steve Wonziak testified at trial that he had known defendant for two years. He stated that in May of 1990, he saw defendant on a public bus and defendant told him he had lost his job in Elmhurst because the police were harassing him. According to Wonziak, defendant also told him that he wanted to get even with the police and make them pay. Likewise, Barbara Patrasso testified that she had known defendant for over two years and that she spoke with him during the week of May 6, 1990. She stated that defendant was upset that he kept getting arrested for not having any car insurance. According to Patrasso, defendant told her that the next time police bothered him, he was "going to blow them away."

At trial, defendant raised the theory of self-defense. In support, he presented evidence concerning his clothing and physical appearance on the night of his arrest on May 13, 1990. Several photographs of defendant's body and face were introduced into evidence and numerous witnesses testified regarding various bruises and abrasions on defendant's body.

At the close of the evidence, the trial court instructed the jury, which later returned a guilty verdict. Following defendant's sentencing hearing, the jury was unable to unanimously find him eligible for the death penalty. Subsequently, the trial court sentenced defendant to life in prison without parole. Defendant then filed this appeal.

First, defendant asserts that he was denied a fair trial because the trial court denied his request to admit his post-arrest statements. At trial, over defendant's objection, the trial court permitted the State to show the jury a videotape of defendant being led from the police station following his arrest. The State assured the trial court that none of defendant's post-arrest statements would be shown. During the showing, however, defendant's statement, "I did what I had to do. That's all I have to say," was printed at the bottom of the video screen. Defendant moved for a mistrial.

During an in-chambers conference, defense counsel argued, *inter alia*, that defendant was prejudiced by the showing of the videotape. He asserted that the statement printed on the screen gave the jury an inaccurate impression of defendant's post-arrest statements to police. In response, the prosecution stated that the tape had been

inadvertently set to the wrong position. The trial court denied defendant's motion for a mistrial and defendant moved to have all of his post-arrest statements admitted. After expressing its concern that the videotape may have caused defendant some unfairness, the trial court denied defendant's request to admit his other post-arrest statements. Defendant contends that the trial court should have admitted his post-arrest statements under the doctrine of curative admissibility to cure the prejudice he suffered from the videotape. We disagree.

Under the doctrine of curative admissibility, a litigant may present inadmissible evidence where necessary to cure undue prejudice possibly resulting from an opponent's introduction of similar evidence. (*People v. Higgins* (1979), 71 Ill. App. 3d 912, 931.) In *Higgins*, this court further reasoned that the doctrine is limited in scope and that the trial court determines, in its sound discretion, whether to admit the curative evidence. *Higgins*, 71 Ill. App. 3d at 931.

●1 Based on our review of the evidence, we cannot say that the trial court abused its discretion in refusing to admit defendant's post-arrest statements. Obviously, the trial court determined that the statement did not rise to the level of undue influence required to invoke the doctrine of curative admissibility. Upon our review of the statement, we believe that it is at worst equivocal, and we remain unpersuaded that it prejudiced defendant such that his other post-arrest statements should have been admitted.

●2 Similarly, we reject defendant's argument that the trial court committed reversible error by admonishing the jury to disregard the following comment made by defense counsel during closing argument: "Ladies and gentlemen, in deciding the evidence, wouldn't you have liked to have heard what [defendant] told the police officers?" The State correctly notes that defendant's post-arrest statements to police were inadmissible based on the State's pretrial motion *in limine* barring their introduction into evidence. Where a trial court determines evidence to be inadmissible, trial counsel may not refer to that evidence during closing argument. (*People v. Mullen* (1990), 141 Ill. 2d 394, 404.) Given the State's motion *in limine,* defense counsel improperly suggested to the jury that the prosecution should have introduced defendant's post-arrest statements. Thus, we believe that the trial court properly admonished the jury to disregard counsel's comments.

We next address defendant's contention that the trial court erroneously barred the defense from presenting evidence of his mental condition. When cross-examining Steve Wonziak, defense counsel asked whether he knew defendant was "mentally kind of slow." The

trial court sustained the prosecutor's objection, reasoning that the witness was not qualified to render such an opinion and that "slow" was too vague. Defendant claims that the evidence was erroneously excluded and he was denied his rights to present a defense and to a fair trial.

Defendant correctly points out that nonexperts may express an opinion regarding an accused's mental condition if based on personal observations made shortly before or after the crime was committed. (*People v. Williams* (1990), 201 Ill. App. 3d 207, 219.) To be admissible, however, such opinions must be "limited to conclusions drawn from the specific facts to which they testified." (*People v. Chatman* (1986), 145 Ill. App. 3d 648, 659.) The trial court determines whether sufficient facts and circumstances have been testified to, and its decision will not be disturbed on appeal unless an abuse of discretion occurs. *Chatman*, 145 Ill. App. 3d at 659.

●3 We do not believe that the trial court abused its discretion in limiting defense counsel's inquiry of Wonziak concerning defendant's mental condition. Although Wonziak testified that he had known defendant for two years, he did not relate any facts or circumstances on which to base an opinion as to defendant's mental condition. (See *People v. Kluxdal* (1991), 225 Ill. App. 3d 217, 225 (where a nonexpert was permitted to testify regarding the defendant's mental condition based on his observation of the defendant's behavior to which the witness testified at trial); see also *People v. McCleary* (1990), 208 Ill. App. 3d 466, 478-79 (wherein nonexpert witnesses' testimony regarding the defendant's mental state was admitted based on their observations as to the defendant's demeanor and behavior to which they specifically testified at trial).) Because we believe defense counsel failed to lay a sufficient foundation for Wonziak's testimony concerning defendant's mental condition, we find no abuse of discretion.

We turn now to defendant's third allegation of error in which he claims that the trial court improperly tendered Illinois Pattern Jury Instructions, Criminal, No. 24—25.09 (2d ed. 1981) (hereinafter IPI Criminal 2d No. 24—25.09). Defendant asserts that IPI Criminal 2d No. 24—25.09, concerning the justifiable use of force by an initial aggressor, should not have been given because no evidence suggested that he was the aggressor. We disagree.

Defendant correctly notes that it is error to give IPI Criminal 2d No. 24—25.09 where no evidence demonstrates that the accused was the initial aggressor. (See *People v. Smith* (1990), 195 Ill. App. 3d 878, 881-82.) However, where conflicting evidence exists as to whether defendant was the aggressor, IPI Criminal 2d No. 24—25.09 may be

properly tendered to the jury. (*People v. Townsend* (1985), 136 Ill. App. 3d 385, 391.) Even minimal evidence which supports a theory that defendant was the aggressor is sufficient to justify giving an instruction based on that theory. *People v. Price* (1987), 158 Ill. App. 3d 921, 928-29.

●4 In the present case, we believe there was adequate support in the evidence to justify the giving of IPI Criminal 2d No. 24—25.09. At trial, Ms. Zuniga testified that when she first spoke with defendant prior to calling 911, the garage light was on and the side door to the garage was unlocked. After the police arrived and entered the garage, however, Ms. Zuniga saw the garage light go out. She then unsuccessfully attempted to enter the garage through the side door, which had been locked. We agree with the State that this evidence supports a permissible inference that defendant barricaded himself in the garage and waited to ambush the police. Thus, we hold that the trial court did not err in tendering the instruction to the jury.

Fourth, defendant claims that the trial court improperly permitted a prosecution witness to read Officers Hauser's and Kilroy's oaths of office into evidence. At trial, Chicago police officer Richard Wedgbury read each officer's oath into the record over defendant's objection. Defendant claims the oaths of office had no relevance in the case and their admission constituted an improper appeal for juror sympathy. We believe this argument is without merit.

●5 Defendant was charged with, *inter alia*, disarming a police officer (Ill. Rev. Stat. 1989, ch. 38, par. 31—1a). As a an element of the offense, the State had to prove that both Hauser and Kilroy were, in fact, police officers. (See *People v. Tye* (1990), 141 Ill. 2d 1, 15.) The officers' oaths established the exact dates Hauser and Kilroy were appointed as police officers and, therefore, were relevant to the issues. Moreover, other than having the oaths read into the record as an element of proof, the State made no further mention of the oaths. Consequently, we remain unpersuaded that use of the officers' oaths was an inflammatory appeal for juror sympathy.

Finally, defendant challenges several arguments presented by the State during closing and rebuttal arguments. Specifically, he asserts that the prosecution committed prosecutorial misconduct in making the arguments which he alleges were improper and denied him a fair trial. When reviewing prosecutorial misconduct claims based on statements made during closing arguments, the court must examine the statements in their entirety and scrutinize them in their proper context. (*People v. Pasch* (1992), 152 Ill. 2d 133, 207.) Moreover, attorneys are entitled to great latitude in closing argument and may properly argue anything supported by the evidence or any

reasonable inference therefrom. (*People v. Mullen* (1990), 141 Ill. 2d 394, 404.) With this in mind, we shall briefly consider each of the alleged errors separately.

•6 First, defendant claims the prosecutor improperly argued facts which were not in evidence regarding the sequence in which Officers Hauser and Kilroy were shot. He correctly notes that no witness testified concerning the exact order in which the officers were shot. However, Dr. Kalelkar and firearms expert Richard Chenow testified as to the location and severity of each bullet wound suffered by the officers, the location of the gun in relation to the officers when shot, and some of the distances from which the officers were shot. This evidence, taken together with other circumstances of the shooting, including the position of Hauser's holster and the location of the officers' bodies when found, convinces us that the prosecutor's inferences concerning the order and sequence of the shots were reasonably based on the evidence. See *People v. Cisewski* (1987), 118 Ill. 2d 163.

Second, defendant challenges the prosecutor's remark in rebuttal concerning Officer Kilroy's shoes, which were neither inventoried by police nor admitted into evidence at trial. Defense counsel stated during closing argument that without the shoes the jury could not know whether they actually caused some of defendant's injuries. In rebuttal, the prosecutor argued that even admitted into evidence, the shoes would not have been shown to have caused defendant's injuries. The trial court sustained defendant's objection to the argument and admonished the jury to disregard the remarks. Defendant claims he was denied a fair trial by the prosecutor's repeated references to Officer Kilroy's shoes despite defendant's sustained objections.

•7 Defendant properly notes that a prosecutor may not express his personal opinion on the evidence or argue assumptions or facts which are not based on the evidence. (*People v. Smith* (1990), 141 Ill. 2d 40, 60.) Moreover, a defendant may be entitled to a new trial where a prosecutor repeatedly defies the trial court's instructions to cease making an improper line of argument. (*People v. Campbell* (1983), 115 Ill. App. 3d 631, 636-37.) However, a new trial will not be granted based on a prosecutor's improper comments during closing argument unless the comments are "so prejudicial as to materially contribute to a defendant's conviction." (*People v. Collins* (1984), 127 Ill. App. 3d 236, 241.) Given the overwhelming evidence of defendant's guilt in the present case, we hold that the comments complained of did not prejudice defendant so as to warrant a new trial.

Third, defendant criticizes the following line of argument made by the prosecutor during closing argument:

"[T]here exist[s] in the city, a record breaking climate of violence and there exists in this city protecting us from that violence, a thin blue line, a thin blue line of officers ***.

* * *

*** [A]ccording to the Supreme Court of the United States, you, a Criminal Court jury, is the conscious [sic] of society, you will decide what is right and what is wrong, you will decide what will and won't be tolerated.

Please send a message to the community that you support law and order, that you support justice."

Defendant maintains that the argument was inflammatory and improperly appealed to the fears and biases of the jury. He also suggests that the prosecutor misstated the role of the jury as a neutral arbiter of the facts and diverted its attention away from relevant issues. We disagree.

As we previously stated, when reviewing allegedly improper remarks made during closing argument, the court must evaluate them in context. (*People v. Cisewski* (1987), 118 Ill. 2d 163, 175-76.) In *People v. Jenkins* (1989), 190 Ill. App. 3d 115, this court reasoned that prosecutorial remarks which may be inflammatory do not warrant a new trial unless they cause substantial prejudice to the accused and a different outcome would have resulted had the comments not been made. (*Jenkins*, 190 Ill. App. 3d at 135.) After reviewing the comments in their proper context, we cannot agree with defendant that they constitute reversible error.

●8 Moreover, in *People v. Batson* (1992), 225 Ill. App. 3d 157, the court held that the prosecutor could properly admonish the jury during closing argument to " 'send a message to the community' that violent crime will not be tolerated." (*Batson*, 225 Ill. App. 3d at 168.) In approving the comments in *Batson*, we reasoned that the prosecution may " 'dwell upon the evil results of crime and to urge the fearless administration of the law.' " (*Batson*, 225 Ill. App. 3d at 169, quoting *People v. Harris* (1989), 129 Ill. 2d 123, 159.) We believe the comments complained of here are analogous to the prosecutorial comments in *Batson*. Consequently, we hold that the prosecutor's comments, when viewed in context, were within the realm of permissible argument.

●9 Similarly, we cannot agree with defendant that he is entitled to a new trial based upon the prosecutor's allegedly improper appeal to juror sympathy. Defendant claims that he was prejudiced by the prosecutor's reference during opening argument to the fact that May 13, 1990, was Mother's Day and that Officer Hauser stopped by his house and visited with his wife prior to the shooting. However, the

462

trial court admonished the jury that comments made during opening and closing arguments are not evidence and that comments not based on the evidence should be disregarded. Therefore, any prejudice which may have resulted from the cited comments was offset by the trial court's admonishments to the jury. See *People v. Manley* (1991), 222 Ill. App. 3d 896, 912.

For the foregoing reasons, the judgment of the circuit court is affirmed. As part of our judgment, we grant the State's request that defendant be assessed $75 as costs and fees for this appeal, pursuant to *People v. Nicholls* (1978), 71 Ill. 2d 166, and *People v. Agnew* (1985), 105 Ill. 2d 275.

Affirmed.

CAHILL and THEIS, JJ., concur.